May it please the Court, Lorene Chittenden's conviction for conspiracy and bank fraud are fatally infected with error and must be reversed. First, a critical piece of evidence used to prove the conspiracy count was a fax cover sheet that was admitted as a statement of a co-conspirator. There was, however, no evidence to demonstrate that the statement was made by a co-conspirator in furtherance of a conspiratorial agreement. Second, Chittenden's conviction for bank fraud cannot stand because there is absolutely no evidence in the record to demonstrate that Chittenden specifically intended to defraud Cardinal Bank, knew the Mason mortgage were used in the ordinary course as a means to obtain property of Cardinal Bank. Third, Chittenden's Sixth Amendment rights were violated because the government restrained all of her assets post-indictment. Assets the government conceded throughout were not proceeds of the charged crimes and thus prevented her from using her untainted assets to fund her defense at trial and on appeal. Did she ever say that she wanted her lawyer of choice? I understand you were the lawyer below and the lawyer on appeal. Did she ever say that she wanted somebody else? There's nothing of that effect on the record, no, Your Honor. How can we get to your argument then? Well, the sum and substance of Louis is not only regarding counsel of choice. The Sixth Amendment right, and this is a very important point I think that Justice Thomas gets at, is that the Sixth Amendment right is a protean right that's multifaceted. And not only is there the right to retain an attorney of choice, but there's also a constituent right to use one's own funds to fund the defense. And that was the Supreme Court statement in Kaplan and Drysdale. So your argument has to do with using her funds, not the fact that she wanted to make a choice. Correct, Your Honor. And it says the Second Circuit stated in the United States v. Stein, and I'll just make sure that I have the quote right, but it is the right to use one's own funds to mount the defense that one wishes to present. And that is the Supreme Court central point of Louis, Your Honor. The government cannot abridge this right by freezing the defendant's innocent funds and forcing a defendant to take on debt, find an attorney willing to work for free, or petition the court for appointed counsel. As Justice Thomas did write in his concurrence, unless the right to counsel also protects the prerequisite right to use one's financial resources for an attorney, I doubt that the framers would have gone through the trouble of adopting such a flimsy parchment. And what's notable about this case is that Lorraine Chittenden's, all of Lorraine Chittenden's funds that were restrained were, and the government conceded this, were completely innocent funds. They were not proceeds of the crime at all. But yet the government restrained them post-indictment and prevented her at all from using those funds to pay for her counsel and to fund the defense in the manner that she wished it to be funded and deprived her of the ability to direct her defense. And that error is structural. There is no requirement, as the Supreme Court made clear, the violation of that Sixth Amendment right is structural. There's no need to find prejudice at all. As the Supreme Court broadly stated and emphasized, it was the wrongful deprivation of the Sixth Amendment right that was at issue. And as the Supreme Court also held in Main v. Moulton in 1985, the government must honor a defendant's right to counsel and may not interfere with that right. The government clearly interfered with the right of a defendant to fund her defense by restraining all of her assets post-indictment. Also, the conspiracy count is fatally, fatally infected with a serious evidentiary error. At the threshold before a statement of a co-conspirator may be introduced, the court must find by a preponderance that a conspiracy did, in fact, exist. The declarant and the defendant were members of that conspiracy and the statement was made in the course of and in furtherance of that conspiracy. This court has repeatedly held that there must be substantial evidence of the conspiracy other than the statement itself. Here, the only two introduced statements made by Francisco Ramos, who was unavailable at trial, and Lorraine Chittenden was the statement that, and this is at JA 453, the statement that Ramos was involved in using some of the false information that Levy discussed in your testimony, the loan applications. Essentially, that Ramos had used fraudulent information before and that the statement occurred within the time frame of the charged conspiracy. There was absolutely no independent preliminary evidence to establish that Chittenden and Ramos were members of a conspiracy. None. Also, the statements themselves, which I think this court made clear, you cannot, the tail cannot wag the dog by simply looking at the statements to prove the conspiracy. Even looking at those statements, they are innocuous. The statements lend nothing to establish that Chittenden was in a conspiracy with Ramos. Ramos told Levy that Chittenden told him that Lenores had insufficient income to qualify for a loan. It is the job of a loan officer to inform a realtor when his client has insufficient income to qualify for a mortgage. It was through this gateway that the government was allowed to introduce probably the most devastating piece of evidence to prove the conspiracy count, which was a fax cover sheet. That fax cover sheet was a communication from Ramos to Chittenden that had copies of 2005-2006 tax returns of Zenaida Lenores. The fax cover sheet said, there are the tax returns 2005-2006. That's the quote, J1531. But there was absolutely no independent evidence, again, no independent evidence to corroborate that Ramos ever sent the fax to Chittenden, which is a very critical piece of evidence, is a very critical point, because Rule 801 D2E requires that the statement had to be made. And there was absolutely no evidence at all that the fax cover sheet had ever even, that the fax itself had ever been sent to Lorraine Chittenden. Neither the fax nor the tax returns, this is another critical point, and the government conceded this. The fax was never found in the George Mason mortgage file at all. There was also no expert testimony to show that there had been a transmission from that particular fax number to Ms. Chittenden's fax number or George Mason Mortgage's fax in the relevant time frame. So there was absolutely nothing. And also importantly, there was absolutely no reason for the taxes to have been sent by the fax or that the fax, that Ramos would send the fax, because the loan in question had already closed. It had closed weeks earlier. There's no reason that a realtor would fax amended tax returns to a loan officer after a loan had closed. None. And also, this evidence was not... Was this evidence that Ramos and your client had worked on the same loan? There are... Notwithstanding, let's assume that the fax was not sent to her. Is this evidence that they worked on the same loan? They did. This was a loan. But also, this was a full document loan. In a conspiracy, are you required to even know everybody that's in a conspiracy? No, you're not required to know everybody that's in a conspiracy. As long as you're working on the common objective, correct? And wasn't this loan one of the common objectives of the conspiracy? There was... To make sure that the tax returns match what was presented as the financial status of the prospective borrower and therefore to make sure they matched up. Was that not the objective of the conspiracy? That was actually not the... The government's theory about what Judge... What Lorraine Chittenden's involvement was, was that she would inflate numbers on applications. Not that she was involved in false tax returns. I know that, but inflating the numbers and then whatever backdrop documents that may be involved have to match up, don't they, at some point? Sure. Because your tax returns become the potential links to what you did before. It's like a HUD-1 statement. It didn't sense, right? HUD-1 statements, subjects reviewed later, you look at tax returns, you can match up and determine whether or not... Not this case, but that's how you... Isn't that a trace document that potentially you have to clean up to make sure it's not discoverable what you did? You said your client was inflating a ledge, you know, convicted of, but inflating the numbers to get the loans, right? That was the basis of the theory. So tell me why that would not be relevant to the conspiracy that they're both working in the same field, if you will, which is the objective of the conspiracy. Well, this individual loan, taking... Because as the district court recognizes, it's a very loose... It characterizes a very loose conspiracy. The government completely veered its allegations throughout this. Taking this particular transaction, there was no evidence showing the conspiracy between Ramos and Chittenden as to this particular transaction. And there was no evidence showing there was no... But that's not required, though, for a conspiracy, is it? The point is that there's evidence that they were both working on the same thing that was related, but they may have different objectives. I'm working on the front end to make sure they qualify. I'm working on the back end to make sure that the documents that have to be filed with the federal government are consistent with what the front end was. For example, why would it have to be working together in order for there to be proper evidence for a conspiracy as alleged by the government? But there has to be evidence of fraudulent intent on behalf of the defendant, that the defendant had engaged in fraud as to this particular transaction. Not that they were just working on the same loan, but that there was an agreement to violate the law. And there's no evidence of that as to this particular transaction. It's just the idea that there is that you cannot establish a conspiracy just because there are different people who may be involved in a similar pattern of unlawful conduct. You have to show that they were not only working on the same project, I think as you aptly stated, but also that there was a criminal agreement and intent as to that project. And there was no evidence at all about this particular project connecting Ramos and Chittenden. That's the point. And the other thing, if I may, is that this evidence was not harmless. The government used this evidence at opening. It said that this evidence would offer a different sort of insight into the defendant's knowledge of the fraud. That's at JA-136. Then at closing, they paraded the evidence again, stating, recounting the Linares loan in detail, including the facts cover sheet, and stated that the facts cover sheet completely corroborates the testimony of David Levy, who was a serial fraudster. And this evidence was used to bolster his testimony. And another thing that's unique about this case as to why, to show the harmfulness of it, this is really unique about this case, is none of the substantive counts on which Ms. Chittenden was convicted were charged as overt acts in the conspiracy. They were completely separate. And the government, in fact, charged 44 loan transactions as overt acts, and they abandoned 37 of them. And these were all, all 37 of these loans were loans that involved the so-called hub of the conspiracy, Rosie Vilches. In fact, and also, the facts cover sheet was absolutely the only written evidence that would corroborate Levy's testimony. And because this devastating piece of evidence was introduced erroneously into evidence, the conspiracy count is fatally infected, and this Court should reverse that count. I see my time is up, Your Honor. Thank you, Mr. Pope. Mr. Calzone. Morning, Your Honors. May it please the Court, Christopher Calzone for the United States. I'd like to begin with Judge Floyd's first question about Luis. And as a Supreme Court held in Luis, the government may violate a defendant's Sixth Amendment rights where the government engages in pretrial post-indictment seizure of untainted funds, one, that are two, needed, three, to obtain counsel of choice. In this case, it's very clear that Ms. Chittenden cannot clear at least two of those key bars. The funds at issue here that were restrained were not needed because she was able, in fact, to retain counsel of choice. That ends the Luis issue. Mr. Pope was talking about the right to pay for counsel of choice, and his argument focused on Justice Thomas' concurrence. And while Justice Thomas raises interesting points in that concurrence, he was alone on the issue of a unique right to pay for counsel of choice. What the Supreme Court has held in discussing the right to counsel of choice is that it focuses on the right to obtain counsel of choice. That's what the Court held in Gonzales-Lopez. And the idea that I would agree that under Gonzales-Lopez the right to obtain counsel of choice is structural. But in this case, the right that was discussed and animated in Luis clearly is not structural. We know that because Luis has a balancing test built into its analysis. You don't have balancing tests with structural rights where you have a structural deprivation. So in this case, there was no total deprivation of any right. Ms. Chittenden obtained counsel of choice, and Luis is simply an opposite on the merits. On the conspiracy... But following the logic of your argument, you retain counsel as here beforehand, well before the pre-indictment investigation, those kind of things, and you run out of money. That's still a counsel of your choice, but aren't you left to some draconian choice that for example, you run out of money and you have to borrow money and add additional stresses on you? Isn't that, in effect, infringing upon and putting undue burden on that right? I think at that point, we're not necessarily in the counsel of choice issue, but more because you have counsel of choice. You still have your retained counsel. And more under a Strickland prong of ineffectiveness. And in fact, the court's opinion in Luis, I think that the first case cited is Gideon, which is not a counsel of choice right. It's an effective assistance of counsel right. So whatever analysis might go further down the road in the instance that your honor is describing, and I'm not sure that the government would concede that once you've got counsel of choice and you run out of money, whether you have any ability to demand additional money for additional work. In fact, the majority, the court was unanimous on the point that the right to counsel of choice has its limits. You're not entitled to the most expensive counsel that money can buy. And at some point, the majority indicated that under this balancing test, courts are well equipped to determine what is necessary for the defendant to obtain effective assistance. Now that's certainly not the case here. There has been no claim, there was never a claim before the district court that Ms. Chittenden did not obtain effective assistance. In fact, that would be a ludicrous claim for her to make here. She has Mr. Davis, who used to be the criminal chief of my office, and about a month when I have to do my mandated discovery training, his video will be the one who teaches me what I can and cannot do when it comes to my Brady obligations and Gigli obligations. This is a platinum counsel that Ms. Chittenden had, and I shouldn't slight Mr. Pope as well. On top of that, at every hearing in this matter, she had at least two counsel, usually three. The docket is clogged with, clogged is the wrong word, is filled with pleadings that she's filed, that the government filed, extensive responses. She received Cadillac representation in this case, has never claimed anything contrary. And as the Tenth Circuit noted in Gordon, when a defendant has obtained counsel of choice and can't point to anything that that counsel of choice should have done or that the counsel could have done to make a difference, there's no violation of the Sixth Amendment. And Gordon is particularly interesting for the court now because, at the best, Ms. Chittenden's on plain error review. And for her to be able to establish plain error in light of her inability to establish any prejudice here, she can't meet that test. On the conspiracy issue, unless the court has any further questions on Louise, Mr. Pope said that there was nothing to support the admission of the Ramos testimony. And I must disagree. In fact, and this is starting about page 450 of the joint appendix, Mr. Levy, who was a named conspirator and indisputably deeply involved, soaked in the fraud that Ms. Chittenden and other members of the conspiracy were partaking in, was in charge of this office. He testified that Mr. Ramos worked for him. Then Mr. Levy, who had just been giving extensive testimony about the fraud that he and Ms. Chittenden engaged in, was asked whether Mr. Ramos was involved in the same activities. He answered yes. Then Mr. Levy was asked whether Mr. Ramos worked on the Linares loan with Ms. Chittenden. That answer was also yes. Judge Gregory, getting to your question about does Ms. Chittenden need to have a particular connection with, in this case, you're exactly right that co-conspirators need not necessarily know each other. And if Ms. Chittenden and Mr. Levy are members of the conspiracy and Mr. Ramos is working in Mr. Levy's shop in an indictment that charges conspirators known and unknown, that's the essence of a loose conspiracy like this. So the idea that Mr. Ramos was not a member of the conspiracy is just not borne out by the evidence. Mr. Pope described this as devastating, the Linares loan, or the most devastating piece of evidence. Again, I disagree. I would say the most devastating indicia of Ms. Chittenden's guilt was when she took the stand herself, in her own words, admitted that she, in her own hand, was the one writing the false, she did not say that the income information was the jury determined was false on all of these loans and that numerous Spanish-speaking, non-English-speaking borrowers had come in and said, I didn't provide any of that information. Ms. Chittenden admitted on direct examination that it was in her own hand or her sister's hand that that information was put on those loan files. That was devastating testimony. And the hub of this conspiracy, as the District Court noted repeatedly, in that sense was Ms. Chittenden. She was the one who, for every single loan, had to go through her before it could be submitted for payment. She was the loan officer. And Mr. Levy testified that he loved to go to Ms. Chittenden because she could always get his clients into a loan. She could always make the numbers work. And the facts itself, Mr. Pope said, pointed out that it wasn't in the mortgage file. Well, of course it wasn't in the mortgage file. The point of this evidence was that the IRS noted, noticed that Ms. Linares had an income on her mortgage application that was much higher than what she claimed on her taxes. And the bank started asking. And that's when the fraudulent tax documents had to be resubmitted after the loan had gone through. So there's no reason for this document to be in the loan file. What the question should be asked is why, if this document was never sent, if this fax was never sent, as Mr. Pope said, or if the government needed to call an extra witness to establish that this fax was sent, why was it found in the files of a Spanish-speaking borrower who had no idea that she had submitted a fraudulent loan application? It doesn't just magically appear there. I'd like to just briefly address the points about forfeiture and just to flag, especially for you, Judge Gregory, who I know dissented in Martin. And I think in the forfeiture issues, Martin controls in this case and, in fact, in this case addresses many of the Rule 35 issues that you pointed out in your dissent. And that when the district court initially pronounced sentence in this case, it indicated forfeiture would be to be determined. Within 14 days, the government moved to clarify or amend that judgment. And then the district court, within 14 days, held another hearing and provided Ms. Chittenden with notice that forfeiture would be impending in this case. So Martin controls on issues of Rule 32.2, but to the extent that there are Rule 35 questions, I'd submit that the district court has no further questions. Unless the panel has any further questions. Thank you, Your Honors. Mr. Pope, do you have some time? Just real quickly, I would like to address the notion of Martin controlling. Martin is quite distinguishable from the situation here. The district court in Martin had already made a determination of the amount of forfeiture. All that was left to do was simply for him to actually write it into the judgment. In this case, there was absolutely wholesale violation of Rule 32.2. The district court had already made a determination of the amount of forfeiture. There was absolutely wholesale. What is the legal significance, though, of an amount being determined if it isn't part of the district court's judgment? I mean, it is of no significance, isn't it? I believe that the amount of forfeiture is part of the judgment. It's part of the sentence. No, but it becomes part of the judgment when the court enters it as part of the judgment, not before. It seems to me the distinction you're making here doesn't really lie. Rule 32.2, I believe, requires that there has to be an entry of the order of forfeiture before a sentence is pronounced. Rule 35 requires... I'm just saying that the attempt on which you're trying to distinguish Martin, you're saying Martin is a different case because at least the court made its determination prior to the sentencing. When was the entry of the order of forfeiture in Martin? The entry of forfeiture, I believe that the error was sometime after the sentence was pronounced. Right. So I don't understand the distinction you're making. See, Rule 36, which was enacted, actually allows for what happened in Martin where a court can correct an error of arithmetic. I'd like to point the court out to the Eighth Circuit's decision in the United States v. Shakur, which fits this case. In Eighth Circuit Shakur, there was a wholesale violation of Rule 32.2. There was no presentation of a preliminary order of forfeiture before a sentence was pronounced. The district court in Shakur did what the district court did here. It said it was going to enter forfeiture, but it was going to do so at a later time and just left the matter open. The Eighth Circuit said you cannot do that. Rule 35 forbids you from amending the sentence once it has been pronounced. And that's consistent with the Supreme Court precedent. Okay, but what if it's a continuation of part of the sentence? Which is what the district court tried to do in Shakur. It tried to continue. It said, well, I'm continuing. This is to be continued. And the Eighth Circuit said you cannot do that. Why? Because Rule 35 provides that sentencing is the oral pronouncement of sentence. The oral pronouncement of sentence. There's no, there's absolutely no statutory or rule, any basis that allows... What's the authority that the sentence imposed by the court is the oral pronouncement? Rule 35. The text of Rule 35. But the validity of the sentence is the court's order, isn't it? But the district court has, by statute, the district court has... Rule 35C defines specifically, this is that quote, sentencing is defined as the oral announcement of the sentence. And according to 18 U.S.C. Section 3582B, an order imposing the sentence constitutes the final judgment. Right, the order imposing the sentence. But once the oral pronouncement of sentence is made and the sentence has been imposed, the district court's authority to modify it at that point is highly, highly circumscribed. It's not simply that the district court then places a document onto the docket. It's that it is orally pronounced, the sentence. That is what, that is the sum and substance of Rule 35. And that is what the Eighth Circuit in Shakur recognized. But it is the order that imposes the sentence, as you just read. Right. The order that imposes the sentence. And here, by the face of the order, it was partial. Because it says, to be determined. So, facially, it's different. You entered an order that has no reference to partiality or incompleteness. But here, facially, it showed incompleteness. Did it not? I don't believe that it, I don't believe it can. I mean, I believe that the statute doesn't allow. It can, but it can't. The court can't. The court cannot do that. It said that here, but the court cannot. And that's the point of United States v. Shakur, is the district court cannot, cannot accrue to itself this boundless jurisdiction to do what happened in this case. What about the fact that the defendant here didn't even ask for a continuation of her sentencing? Does that affect your analysis? No, Your Honor, not at all. She's entitled, she's entitled to be sentenced and to serve her time as quickly as possible. That's, that's her right. She's right to, she has a right to finality. She can sit back and let the court commit errors, essentially what you're saying, and then complain about it for the first time on the field. No, Your Honor, I don't believe that's what happened here at all. I believe that what happened here was the government, which is what the district court pointed out a year later, mind you, that the government had failed to carry its burden to do what it was supposed to do under the rules. The government waited until the evening, the evening before sentencing to send in a motion for a preliminary order of forfeiture. That's what happened. It was not the district court committing error. It was, she has no duty, she has no duty to allow the government or cause the government to do what it's supposed to under the rules. She doesn't have an affirmative duty to do that. She simply awaited sentencing and the did not follow the rules. And under the precedent that I think this court should follow, which is the Eighth Circuit's decision should occur, the, what the district court did here is improper and the order of forfeiture in this case should be reversed. Thank you. Thank you, Your Honor. We'll come down and greet counsel and then go to our next case.
judges: Roger L. Gregory, Barbara Milano Keenan, Henry F. Floyd